Jeffrey T. PALMER, Plaintiff-Appellant,

v.

BEVERLY ENTERPRISES, a
California corporation,
Defendant-Appellee.

No. 86–1800.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 3, 1986.

Decided July 7, 1987.
Rehearing and Rehearing En Banc
Denied Aug. 20, 1987.

James K. Lennon, DiLeonardi & Brothier, Ltd., DesPlaines, Ill., for plaintiff-appellant.

Michael S. Cecere, Jackson Lewis, Schnitzler & Krupman, New York City, for defendant-appellee.

Before CUMMINGS, CUDAHY, and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

In this diversity action, plaintiff, an Illinois citizen, sued defendant, a California corporation with its principal place of business in California. Defendant's corporate offices are located in Pasadena in that state. Count I of the complaint was for $150,000 for breach of an employment contract. Count II was for $300,000 (including punitive damages) for fraud and alleged that defendant misrepresented that it would purchase plaintiff's Illinois home after he commenced working for defendant in California. Upon completion of discovery, defendant moved for summary judgment and the district court granted that motion. We reverse and remand for trial.

Over a two-month period beginning in March 1983 plaintiff interviewed and negotiated with the defendant corporation for employment in its Western Division acquisition office in California. These meetings occurred in Illinois and California and included a four-day trip by plaintiff and his wife to Fresno, California, to meet the president of defendant's Western Division and to look for housing. On April 27, 1983, plaintiff met with Dan Bruns, one of defendant's vice presidents, at its Jackson, Mississippi, office. During that meeting plaintiff was orally offered a position with defendant but claims that he did not commit himself. When he returned to Illinois, he received a letter dated April 28 from Bruns "recapping" their April 27th discussion regarding his becoming Acquisition Director for defendant's Western Division in Fresno, California. In the letter, defendant agreed to pay plaintiff's relocation expenses. His beginning date was set for May 19. Upon receiving this letter in Illinois, he allegedly accepted this offer by telephone from Illinois to Mississippi on April 29.

Plaintiff was terminated by defendant on October 14, not long after he requested defendant to purchase his unsold house in Schaumburg, Illinois. Its appraised value was $195,000–$197,000. Plaintiff's App. 28.

On April 18, 1986, the district court filed a memorandum opinion and order granting summary judgment to defendant under both the breach of contract and fraud counts.

## I

The initial question presented is what state's law applies to the contract claim. As noted, plaintiff allegedly accepted defendant's offer in a telephone call from Illinois to Mississippi on April 29, and the district judge assumed this to be true. The district court recognized that "[t]he last act necessary to complete the agreement was plaintiff's acceptance of the terms." Plaintiff's App. 17. Nevertheless, Judge Leinenweber concluded that the contract was executed in Mississippi because he thought defendant's hearing plaintiff's acceptance on the Mississippi side of the interstate telephone call was the last act necessary to

make the contract. He then concluded that Mississippi law applied to the claim because he thought the old rule of the law of the place of making the contract or *lex loci contractus* was the choice of law principle applied by Illinois courts when the performance is to be in more than one state and the making of the contract is in one state.

█ The district court erred when it concluded that the *lex loci contractus* rule is still followed by Illinois courts and that the Second Restatement of Conflict of Laws rule of choosing the forum with the "most significant contacts" is only applied by Illinois courts in multifaceted contractual situations. This Court held in *Florida Risk Planning Consultants, Inc. v. Transport Life Insurance Co.*, 732 F.2d 593 (7th Cir. 1984), that the Illinois Supreme Court would apply the most significant contacts rule in all choice of law disputes involving contracts. There we stated that "Illinois courts have adopted the rules of the *Restatement (Second) of Conflicts* (1971)" and proceeded to apply the Second Restatement's most significant contacts rule of § 188 and the illegality rule of § 202 to determine the applicable law and the legality of an alleged implied contract requiring the payment of commissions for procuring insurance business. 732 F.2d at 595–596 (emphasis in original); see *In re NuCorp Energy Sec. Litig.*, 772 F.2d 1486, 1492 (9th Cir.1985) (applying most significant contacts rule to decide applicable law for contract dispute originally filed in the federal district court in Illinois and concluding on the basis of *Florida Risk Planning* that Illinois has adopted the choice of law rules of the Second Restatement); *Sarnoff v. American Home Products Corp.*, 607 F.Supp. 77, 80 (N.D.Ill.1985) (Illinois courts follow the Second Restatement's most significant contacts rule in contract cases), reversed in part on other grounds, 798 F.2d 1075 (7th Cir.1986). Therefore, no matter whether plaintiff accepted the defendant's offer over the telephone on April 29—thus arguably executing the contract in both Illinois and Mississippi and resulting in a multifaceted contractual situation within the meaning of *P.S. & E., Inc. v. Selastomer Detroit, Inc.*, 470 F.2d 125, 127 (7th

Cir.1972)—or at the prior meeting in Mississippi on April 27—thus executing the contract in Mississippi—the choice of law is determined by the most significant contacts rule.

Defendant urges us that Illinois courts still adhere to the *lex loci contractus* rule. The traditional choice of law rules followed by Illinois courts were that the law of the place of performance applied when the contract was to be performed wholly in one state, but if the contract were to be performed in more than one state, then the law of the place of contracting applied. *Oakes v. Chicago Fire Brick Co.*, 388 Ill. 474, 58 N.E.2d 460 (1944); *Walker v. Lovitt*, 250 Ill. 543, 95 N.E. 631 (1911). However, this Court held in *P.S. & E., Inc.* that based on "the analogous modern tort cases relying upon the 'most significant contacts' rule," including *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593 (1970), the Illinois Supreme Court would not apply the doctrine of *lex loci contractus* in a multifaceted situation. In *Florida Risk Planning* we concluded on the basis of those tort cases and two later Illinois Appellate Court cases on choice of law in contracts and trusts that in all choice of law disputes involving contracts Illinois courts apply the law of the jurisdiction with the most significant contacts. Defendant's argument is foreclosed by *Florida Risk Planning*, and our own examination of the Illinois cases convinces us that there is no need to reconsider this holding.

*Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593 (1970), signifies that the Illinois Supreme Court will not rotely apply traditional conflict of laws rules when they result in the application of laws of a forum with little if any significant contacts with the underlying dispute. See *id.* at 45, 262 N.E.2d at 595. Although *Ingersoll* dealt with conflict of laws rules for torts, its reasoning extends to contract cases. In *Ingersoll* the court rejected the traditional rule of *lex loci delecti*, which calls for application of the law of the place of the tort. That traditional rule was based on the much criticized "vested rights doctrine," which reasoned that " 'a right to

recover for a foreign tort owes its creation to the law of the jurisdiction where the injury occurred and depends for its existence and extent solely on such law.'" *Id.* at 46, 262 N.E.2d at 595 (quoting *Babcock v. Jackson,* 12 N.Y.2d 473, 477–478, 240 N.Y.S.2d 743, 746, 191 N.E.2d 279, 281 [1963]). The same premise also underlies the *lex loci contractus* rule, as was explained by Professor Beale, who was the Reporter for the First Restatement on Conflict of Laws:

> If the law [of the place of contracting] annexes an obligation to the acts of the parties, the promisee has a legal right which no other law has power to take away except as a result of new acts which change it. If on the other hand the law of the place where the agreement is made annexes no legal obligation to it, there is no other law which has power to do so.
>
> ... This doctrine gives full scope to the territoriality of law, and enables each sovereign to regulate acts of agreement done in his own territory.

2 J. Beale, A Treatise on the Conflict of Laws § 332.4, at 1091 (1935); see Restatement of Conflict of Laws §§ 311, 332 (1934); see also Restatement (Second) of Conflict of Laws §§ 186–221 introductory note, at 557 (1971) (traditional choice of law rules for contracts and torts in the First Restatement were derived from the vested rights doctrine, but that doctrine "has not prevailed in the courts and is rejected" by the Second Restatement).

The Illinois Supreme Court has criticized the vested rights doctrine for not considering the interests of states other than the one where the tort occurred. The court quoted approvingly from the New York Court of Appeals' conclusion that

> "the vested rights doctrine has long since been discredited because it fails to take account of underlying policy considerations in evaluating the significance to be ascribed to the circumstance that an act had a foreign situs in determining the rights and liabilities which arise out of that act.... [T]he theory ignores the interest which jurisdictions other than

that where the tort occurred may have in the resolution of particular issues."

*Ingersoll,* 46 Ill.2d at 46, 262 N.E.2d at 595 (quoting *Babcock v. Jackson,* 12 N.Y.2d at 478, 240 N.Y.S.2d at 746, 191 N.E.2d at 281 (footnote omitted)). The New York Court of Appeals in that case noted the shared origin, deficiencies, and demise of the traditional rules of *lex loci delecti* and *lex loci contractus:* "[I]t was dissatisfaction with 'the mechanical formulae of the conflicts of law' (*Vanston Committee v. Green,* 329 U.S. 156, 162 [67 S.Ct. 237, 239, 91 L.Ed. 162 (1946)]), which led to judicial departure from similarly inflexible choice of law rules in the field of contracts, grounded, like the tort rules, on the vested rights doctrine." *Babcock,* 12 N.Y.2d at 479, 240 N.Y.S.2d at 747, 191 N.E.2d at 281–282. The criticism of choice of law rules grounded on the vested rights doctrine applies with full force to this case where Mississippi's only interest in this dispute is by virtue of the alleged making of the contract there (after two months of extensive negotiations in California and Illinois) and the significance traditionally bestowed upon that fact by the vested rights doctrine. See Restatement (Second) of Conflict of Laws § 188 comment e at 579 ("Standing alone, the place of contracting is a relatively insignificant contact."). The interest of California in protecting California workers from wrongful discharge and regulating its corporations and employment relations in the state and the interest of Illinois in protecting its residents who may be lured out of state by later-breached employment offers are ignored by the formalistic approach of the *lex loci contractus* doctrine. As this case amply illustrates, the divergence between legal fiction and real jurisdictional interests is too great; therefore, the Illinois Supreme Court would apply the most significant contacts rule rather than the *lex loci contractus* rule.

Our conclusion that the most significant contacts rule applies to this case even if no multifaceted situation exists is supported by recent Illinois Appellate Court cases holding that the most significant contacts rule is to be used in all conflict of law cases involving contracts. *Illinois Tool Works v.*

*Sierracin Corp.*, 134 Ill.App.3d 63, 69, 89 Ill.Dec. 40, 44–45, 479 N.E.2d 1046, 1050–1051 (1st Dist.1985); *Boise Cascade Home & Land Corp. v. Utilities, Inc.*, 127 Ill. App.3d 4, 12–13, 82 Ill.Dec. 180, 186–187, 468 N.E.2d 442, 448–449 (1st Dist.1984); *Champagnie v. W.E. O'Neil Construction Co.*, 77 Ill.App.3d 136, 144–146, 32 Ill.Dec. 609, 615–616, 395 N.E.2d 990, 996–997 (1st Dist.1979); see *Ford v. Newman*, 64 Ill. App.3d 528, 533, 21 Ill.Dec. 283, 287–288, 381 N.E.2d 392, 396–397 (4th Dist.1978) (trust case), affirmed on other grounds, 77 Ill.2d 335, 33 Ill.Dec. 150, 396 N.E.2d 539; see also Restatement (Second) of Conflict of Laws § 188(1) (1971). In *Champagnie*, the court relied on *Ingersoll* and adopted for choice of law disputes involving contracts the most significant contacts rule set out in the Second Restatement. 77 Ill. App.3d at 144–146, 32 Ill.Dec. at 615–616, 395 N.E.2d at 996–997. Instead of following the traditional rule that when an agreement is to be fully performed in one state the law of that state applies, which would have required the application of Wisconsin law, the court examined the interests of Wisconsin and Illinois in the contract dispute and decided Illinois' interests were greater and applied Illinois law. Soon thereafter in *Ford v. Newman*, a trusts case, the Appellate Court of Illinois recognized the Illinois trend favoring the use of the most significant contacts rule: "We conclude that the recent Illinois policy of applying, in conflict of laws situations, the law of the State having the most significant contacts is appropriate for this case and find Illinois to be that State." 64 Ill.App.3d at 533, 21 Ill.Dec. at 287–288, 381 N.E.2d at 396–397. Although the later case of *Boise Cascade* involved a multifaceted situation—the contract was to be performed in Illinois and Indiana and the place of execution was uncertain—and thus the most significant contacts rule would be used as we predicted in *P.S. & E., Inc.*, the court made clear that under emerging Illinois jurisprudence the most significant contacts rule applies even when there is not a multifaceted situation:

> *Champagnie* clearly requires analysis under the significant-contacts test. We

further note that had the facts of this case been different, we would have followed *Champagnie*, and we believe that the most significant-contacts test should be followed in conflict of laws cases involving contracts.

127 Ill.App.3d at 13, 82 Ill.Dec. at 187, 468 N.E.2d at 449. Finally, in *Illinois Tool Works*, a contract case involving the doctrine of *forum non conveniens*, one element of which is whether the suit requires applying the law of the foreign jurisdiction, the court used the most significant contacts rule to resolve the choice of law question, although a multifaceted situation was not present. The court cited *Champagnie* for a list of the relevant factors for determining the significance of the contacts and stated:

> California law will govern the present contract dispute under the "most significant contacts" test of the Restatement (Second) of Conflict of Laws sec. 188(1) (1971). The second Restatement provides that where, as here, there is an absence of an effective choice by the parties as to which law should govern the contract, the rights of the parties with respect to an issue in a contract are determined by the local law of the State which, with respect to that issue, has the most significant relationship to the transaction and parties.

134 Ill.App.3d at 69, 89 Ill.Dec. at 44–45, 479 N.E.2d at 1050–1051. Based on *Ingersoll* and the unmistakable trend in recent Illinois Appellate Court cases, we remain confident that Illinois law calls for the use of the most significant contacts rule in all choice of law disputes involving contracts, and following the commands of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, and *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, we apply that rule here.

Illinois cases have identified the contacts relevant to the choice of law decision as including "the place of contracting, negotiation, performance, location of the subject matter of the contract, and the domicil[e], residen[ce], place of incorporation, and

business of the parties." *Champagnie*, 77 Ill.App.3d at 145, 32 Ill.Dec. at 615, 395 N.E.2d at 996 (following Restatement (Second) of Conflict of Laws § 188(2) (1971)); see *Illinois Tool Works*, 134 Ill.App.3d at 69, 89 Ill.Dec. at 45, 479 N.E.2d at 1051. Here the place of contracting, the first factor, was arguably Illinois or Mississippi, unless plaintiff accepted during the meeting in Mississippi, which would then be the place of contracting. As for the place of negotiation, some negotiation occurred during the offer and acceptance in Mississippi and Illinois at the end of April, but the majority of negotiations occurred in correspondence between Illinois and California and meetings of plaintiff and Beverly officials in Illinois over a two-day period and in California over an eight-day period. This second factor, negotiations, favors California. Performance of the contract was to take place in an eight-state area—California, Oregon, Washington, Nevada, Idaho, Montana, Utah, and Wyoming—but Fresno, California, was to be the base of his operations. Defendant does not deny that its Western Division had no facilities outside of California and that 80% of plaintiff's working hours were spent physically in that state. Although performance was to occur in all eight states, the majority of it took place in California and the third factor, performance, therefore favors the use of California law. For the same reasons, the situs of the employment contract, the fourth factor, was California. Finally, plaintiff was a domiciliary and resident of Illinois and defendant is a corporation incorporated under the laws of California with its principal office in Pasadena, California, and its Western Division office in Fresno, California. This fifth and final factor favors California and Illinois.

■ An analysis of the five factors shows that Mississippi's contacts are insignificant to the case and thus it was error to apply Mississippi law. As between Illinois and California, California has more significant contacts because most of the negotiation took place there, most of the performance was to occur there, and the situs of the employment contract was also there. See Restatement (Second) of Conflict of Laws § 188(3) (if place of negotiation and performance of the contract are the same, that state's laws usually will apply). Of all the states involved, California had the greatest interest in regulating this employment relationship which was centered in California, mainly performed in California, and involved a California employer. The district court concluded hypothetically that if it had applied the most significant contacts rule, it would have chosen Illinois law (Plaintiff's App. 21), but the court failed to consider the extent of performance in the eight Western Division states, which was not equal and clearly favored California. Similarly, defendant contends that California was not the place of the most significant contacts because plaintiff was employed to consider acquisitions of nursing homes in defendant's Western Division encompassing seven western states in addition to California. The contention fails because there is no evidence that any of those other states had more significant contacts than California. In fact the evidence is to the contrary. It was in California that plaintiff spent 80% of his business time, where he was required to live, and where he moved his family and was building a new home.

■ The district judge dismissed the breach of contract claim because he thought Mississippi law applied and he ruled that under Mississippi law no cause of action exists for termination of an at-will employment contract. We have held that California law applies to this count. Defendant does not contest that under California law an employment contract containing a bargained-for implied provision that the employer will only terminate employment for cause is not terminable at will, and proof that an employee gave consideration in addition to services rendered allows an inference that the contract contained such a provision. *Hillsman v. Sutter Community Hospitals*, 153 Cal.App.3d 743, 751–753, 200 Cal.Rptr. 605, 610–611 (1984); *Pugh v. See's Candies*, 116 Cal. App.3d 311, 324–329, 171 Cal.Rptr. 917, 924–927 (1981); see *McGrath v. Zenith Radio Corp.*, 651 F.2d 458, 465 (7th Cir.),

certiorari denied, 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981) (applying California law). Here plaintiff claims that his employment contract contained a bargained-for implicit provision that he would only be fired for cause, and the existence of that alleged provision was evidenced by his agreeing to move his family and home to California. See *Brawthen v. H & R Block, Inc.*, 52 Cal.App.3d 139, 149, 124 Cal.Rptr. 845, 851–852 (1975) ("A detriment, in the form of removal of family and foregoing of other business and contacts, if bargained for, will constitute sufficient consideration to support a contract for permanent employment."); see also *Pugh*, 116 Cal.App.3d at 326–327, 171 Cal.Rptr. at 925–926. Plaintiff testified in his deposition that Beverly officials told him that defendant was hiring him to work in the Western Division office for a period of two to five years followed by a promotion, and allegedly explained to him that Beverly Enterprises needed a "commitment" from plaintiff to work that long and was "willing to make a commitment" because plaintiff would not know the market and be "profitable" for Beverly until the fourth or fifth year of work. Plaintiff's App. 48, 58, 70, 72–73, 76. In the present case, a factual dispute exists that when viewed most favorably to plaintiff, as the non-moving party, and under the governing law, which is that of California, would allow a reasonable jury to return a verdict for plaintiff and thus precludes the entry of summary judgment. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510–2512, 91 L.Ed.2d 202.

Defendant argues that even if California law applies to this case, the California statute of frauds provides an independent basis for affirming the district court's grant of summary judgment. The statute of frauds issue was argued below and fully briefed on appeal; furthermore, defendant's claim is purely a legal question of whether a contract with an implied provision guaranteeing (absent just cause for termination) employment for more than one year violates the California statute of frauds. Given these considerations, this Court properly could affirm the grant of summary judgment on the grounds of the statute of frauds, although not reached by the district court, and it is no less proper to decide this issue even though we do so unfavorably to the moving party and are reversing the grant of summary judgment. See *Maguire v. Marquette University*, 814 F.2d 1213, 1216 (7th Cir.1987); *Martinez v. United Auto., Aerospace & Agricultural Implement Workers*, 772 F.2d 348, 353 (7th Cir.1985); *Cannon v. University of Health Sciences/Chicago School of Medicine*, 710 F.2d 351, 363 (7th Cir.1983); see also *Morgan Guaranty Trust Co. v. Martin*, 466 F.2d 593, 600 (7th Cir.1972) (*per curiam*) (where district court dismissed case for failure to join an indispensable party, this Court reversed and also directed district court to enter summary judgment for plaintiff because there was no genuine issue of material fact and the law was in plaintiff's favor). When both sides have had the opportunity to address the issue, "[a] contrary rule would simply multiply proceedings in the district courts and appeals to courts of appeals." *Martinez*, 772 F.2d at 353.

Turning to the merits of the issue, there was no violation of the California statute of frauds because defendant's offer of employment was contained in its April 28th letter/memorandum (Plaintiff's App. 29–30), which set forth the essential terms of the offer and was signed by the party to be bound, and thus satisfied the statute of frauds. Cal.Civil Code § 1624 (West Supp. 1987); see *Levin v. Knight*, 780 F.2d 786, 787 (9th Cir.1986) (applying California law). As *Hillsman* and *Pugh* recognize, the termination-for-just-cause provision need not be in writing but instead can be an implied provision under California law. On remand the trier of fact will have to decide whether under California law plaintiff is entitled to recover on his breach of contract claim.

## II

As to Count II alleging defendant's misrepresentations about the purchase of plaintiff's Illinois house, the district court determined that there was insufficient evi-

dence to enable a reasonable jury to conclude that defendant had promised to purchase it. However, in his deposition plaintiff testified that he told defendant's vice president Bruns that he was only willing to undertake the risk of selling his Illinois house for 90 days, and Bruns replied that he would "go to bat for [me] in 90 days" and get the house purchased, and that plaintiff received the impression from Bruns "that he had discussed that [the purchase of the home] with David Banks and Bill Wright and Ralph Lemon," all Beverly officials. Plaintiff's App. 80–83. Bruns told plaintiff that "[h]e had facilitated a similar agreement with John Todd." *Id.* at 82. Bruns also said "I am going to buy your home," of course referring to defendant's doing so. *Id.* at 83. Plaintiff insists that Bruns had fraudulently represented that defendant would purchase the house and, when he pressed Bruns to carry out the promise, he was fired.

Defendant submits that plaintiff " 'would have threatened [legal] action right on the spot' " (Defendant's Br. 39 (quoting Bruns' Deposition)), if defendant had tried to avoid its promise to take over the sale of his Illinois house, but the trier of fact could conclude that a new employee could hardly afford to be so demanding. Moreover, while defendant relies on its relocation policy to show that "it is the responsibility of the employee to undertake the sale of his home" (*id.* at 39–40), another provision of the same policy provides:

> The use of the Executran service will only be used in special situations, and requires the approval of the Corporate President or the Senior Vice President of Finance.

Plaintiff's App. 31. This excerpt could allow an inference that defendant contemplated using Executran's service to sell an employee's home if approved by one of its top officers. From his conversation with Bruns, plaintiff believed that such an approval was or could be obtained. This too will have to be explored by the trier of fact on remand.

■ Whether the proffered facts are sufficient to enable a reasonable jury to return a verdict for plaintiff on the fraud claim must be determined based on the applicable law. Illinois conflict of law principles for torts require the use of the most significant contacts rule. *Ingersoll v. Klein*, 46 Ill.2d 42, 48, 262 N.E.2d 593, 596 (1970). The contacts relevant to this choice of law determination are: (1) the injury occurred in California and Illinois because when the 90–day period ran and the house was not purchased as was allegedly promised, plaintiff, in reliance upon the promises, had established a new home in the former state and was still maintaining his old house in the latter, with all the attendant expenses; (2) the conduct causing the injury was the fraudulent statements allegedly made by Bruns during the April 27th meeting in Mississippi; (3) at the time the promises were made plaintiff was a domiciliary of Illinois and then he became a domiciliary of California in reliance thereon and defendant was a California corporation with its principal place of business in California; (4) the center of gravity of the relationship of the parties was California where plaintiff mainly performed the job he was induced to accept, where he relocated his family in reliance upon the statements, and where much of the contractual negotiations had taken place; and (5) plaintiff acted in reliance upon the representations in California and Illinois by leaving the latter and establishing his job and home in the former. See Restatement (Second) of Conflict of Laws §§ 145(2), 148(2) (1971). California has the most significant contacts to the fraud claim because the purpose of the alleged fraudulent representations was to induce plaintiff to work there and relocate his family there, the injury occurred in part there, the relationship between the parties was centered there, the defendant was a California corporation with its principal place of business there, and plaintiff, at the time of injury, was a domiciliary there.

To defeat plaintiff's fraud claim, defendant argues that any promises made to plaintiff about the sale of his house were "promises of events to occur *in futuro*" and would not give rise to a cause of action for fraud. Defendant's Br. 41–42. However, California law supports plaintiff's

claim notwithstanding that the sale in question was to be a future happening. In *Miller v. National American Life Insurance Co.*, 54 Cal.App.3d 331, 338, 126 Cal. Rptr. 731, 734 (1976), the court stated: "It is well settled that a 'promise made with no intention of performing is actionable fraud where the other party relies upon it as an inducement to enter into an agreement.'" See *Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 28–31, 702 P.2d 212, 218–219, 216 Cal. Rptr. 130, 135–137 (1985) (action for fraud maintainable even when the allegedly fraudulent promise is unenforceable as a contract due to statute of frauds). In *McGrath v. Zenith Radio Corp.*, this Court applied California law and upheld a jury verdict for plaintiff on his fraud claim that he transferred stock options on account of the oral promise that "he would be the heir apparent" when the then-president retired, but was not informed of the unlikeliness of the ascendancy when the promisor learned of that fact. We stated: "The making of the original statements, the discovery of their falsehood, and the failure to correct them before plaintiff relied on them were 'elements in a continuing course of conduct' capable of establishing fraud." 651 F.2d at 468. It is for the trier of fact to determine whether Bruns promised on defendant's behalf to purchase plaintiff's house and, if so, whether Bruns knew that promise to be false at the time of its making or soon discovered it to be false and failed to disclose that fact to plaintiff.

In sum, the summary judgment based on depositions and exhibits was improper because at trial plaintiff might be able to show that under California law he was wrongfully terminated and that defendant fraudulently induced him to leave his job and move by promising to purchase his Illinois house if he failed to sell it within 90 days after his employment. The many necessary credibility determinations cannot be made on the cold record that was before the district court, thus making summary judgment improper.

The judgment is reversed and the cause is remanded for trial on both Counts I and II.

EASTERBROOK, Circuit Judge, concurring.

Illinois, the forum state, supplies the choice-of-law rules that tell us which state's substantive law applies. *Florida Risk Planning Consultants, Inc. v. Transport Life Insurance Co.*, 732 F.2d 593, 595 (7th Cir.1984), holds that Illinois applies the approach of the *Restatement (Second) of Contracts* § 188(1) (1971), under which the state at the center of gravity of a contractual transaction supplies the legal rules. That decision governs.

Whether *Florida Risk* accurately divines state law is another matter. When last the Supreme Court of Illinois addressed the subject, in 1944, it used the rule of the First Restatement. This rule is that the law of the state in which a contract is made determines its existence and meaning even if performance spans more than one state. *Oakes v. Chicago Fire Brick Co.*, 388 Ill. 474, 58 N.E.2d 460 (1944); *Walker v. Lovitt*, 250 Ill. 543, 95 N.E. 631 (1911). When the contract is made in more than one state, the law of the place of performance applies. Only when the contract is both made and performed in more than one state does the law of the state at the "center of gravity" of the contractual relation—the one with the "most significant contacts"—apply.

Recent decisions by intermediate courts of Illinois essentially decline to follow *Oakes* and *Walker*, in light of *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593 (1970), which applied the most-significant-contacts approach to tort litigation. The Supreme Court itself has yet to tell us whether it will follow this lead. Even if the intermediate courts of Illinois are engaged in civil disobedience in the interim, we should decide this case as it would be decided in Illinois. The day-to-day law of Illinois is the Second Restatement rather than the First. There are some dissenting voices. Listen to *Boise Cascade Home & Land Corp. v. Utilities, Inc.*, 127 Ill.App.3d 4, 12, 82 Ill.Dec. 180, 186, 468 N.E.2d 442, 448 (1st Dist.1984) (citations omitted): "Under traditional Illinois conflict-of-laws principles, the law of the place where the con-

tract is performed and executed is applicable in determining the validity, construction and obligations of the contract. Where performance and execution occur in different States, the law of the place of performance governs. Where a contract is to be performed in more than one State, the law of place of execution is controlling. Federal courts applying Illinois law have followed the traditional test, but have noted a trend in Illinois of adopting the most-significant-contacts test in conflict of laws cases. However, the courts in each of the aforementioned cases were required to resort to the most-significant-contacts test because the contracts in issue were performed and executed in more than one State." This is a lone voice among recent decisions, however, and even *Boise Cascade* went on to use the center-of-gravity approach as well.

It is unfortunate that we must grope to resolve an issue so fundamental to diversity litigation. Perhaps the federal courts now hear such a large portion of cases arising out of multi-state commercial transactions that the Supreme Court of Illinois has not had an occasion since 1971 to decide whether *Ingersoll* applies to contracts. Perhaps, alternatively, that court thinks the answer so plain that it need not be given. No matter the reason, it is regrettable that a federal court must decide whether to follow the appellate or the supreme court—and find it necessary to choose the appellate court.

I join the court's opinion in all respects but one. My colleagues endorse the approach of the Second Restatement. I do not think that our approval or disapproval of the foundations of state law is appropriate. Thoughtful judges and scholars endorse the Second Restatement; others believe that the ALI had it right the first time and that the experiment with interest-balancing is a flop. I have private views on this subject but as a judge will do whatever Illinois wants. The rule of law does not depend on our endorsement.