Jacob J. FINK and Peterson Corp., Inc., f/k/a Brighton Products, Inc., an Illinois Corporation, Plaintiffs and Counterdefendants,

v.

Ronald DeCLASSIS and L.T. Laboratories, Inc., a/k/a L.T. Corporation, a Massachusetts Corporation, Defendants and Counterplaintiffs.

No. 90 C 401.

United States District Court,
N.D. Illinois, E.D.

Aug. 20, 1990.

Michael J. Rovell, Joel J. Africk, Lisa I. Fair, Jenner & Block, Chicago, Ill., for plaintiffs and counterdefendants.

Bradley C. Pinta, Michael J. Griffin, Sullivan, Sullivan & Pinta, Boston, Mass., James Ossyra, Hopkins & Sutter, Chicago, Ill., for defendants and counterplaintiffs.

## MEMORANDUM ORDER

BUA, District Judge.

Plaintiffs Jacob J. Fink and Peterson Corporation have moved to dismiss several counts of defendants' counterclaim pursuant to Fed.R.Civ.P. 12(b)(6). Specifically, plaintiffs contend that Counts I, III, IV, V, IX, X, and XI should be dismissed as to both Fink and Peterson, while Counts VI and VIII should be dismissed as to Fink only. Pursuant Fed.R.Civ.P. 12(f), plaintiffs have also moved to strike Counts IV and VIII. For the reasons stated herein, plaintiffs' motion to dismiss is granted with respect to Counts I, III, IV, V, IX, X, and XI, and denied with respect to Counts VI and VIII; plaintiffs' motion to strike is denied.

## FACTS

Peterson Corporation ("Peterson") is an Illinois corporation which manufactures and distributes health and beauty aid products. From the time it first introduced its products into the marketplace, Peterson enjoyed tremendous commercial success. Peterson's rapid success drew the attention of L.T. Corporation ("LT"), a Massachusetts corporation which also distributes health and beauty aid products. LT eventually became interested in acquiring the assets of Peterson. In 1989, LT approached Jacob J. Fink, the president of Peterson, to discuss the possibility of an acquisition. In particular, LT was interested in purchasing the assets associated with Peterson's two eye care product lines known as "Eyegel" and "Eyepac."

After several months of negotiations, Peterson agreed to sell the Eyegel and Eyepac product lines to LT. The parties executed an asset purchase agreement dated April 26, 1989, and the sale was closed on June 21, 1989. One month later, the Food and Drug Administration detected bacteria in large quantities of the Eyegel product. This discovery prompted a nationwide recall of Eyegel.

Due to the contamination of the Eyegel product, LT's sales decreased dramatically. Having suffered a financial loss from its newly acquired product lines, LT filed a lawsuit against Fink and Peterson in the United States District Court for the District of Massachusetts. LT's complaint asserts a variety of state law claims, including breach of contract and breach of warranty.

On January 23, 1990, plaintiffs filed the instant case against LT and its president, Ronald DeClassis. According to plaintiffs, LT and DeClassis mismanaged the Eyegel and Eyepac product lines, and failed to fully satisfy their contractual obligations. In addition, plaintiffs accuse LT and DeClassis of defamation.

Shortly after plaintiffs commenced this action, defendants filed a counterclaim. Defendants also moved to transfer the case to the District of Massachusetts. This court subsequently denied the motion to transfer. *See Fink v. DeClassis*, 738 F.Supp. 1195 (N.D.Ill.1990). Fink and Peterson now move to dismiss most of the counts contained in defendants' counterclaim.[1]

---

1. To avoid confusion, the court will refer to defendants/counterplaintiffs DeClassis and LT as "LT." Plaintiffs/counterdefendants Fink and Peterson will be referred to as "Peterson," except where inappropriate.

## DISCUSSION

### *Count I—Fraud*

In Count I, LT asserts a claim for common law fraud. Peterson has moved to dismiss that claim, arguing that LT has failed to plead the necessary elements of fraud under Illinois law. In response, LT contends that Massachusetts law governs the fraud claim and that the allegations are sufficient under Massachusetts law.

■ As a preliminary matter, the court must determine whether Illinois law or Massachusetts law applies to LT's fraud claim. Pursuant to *Klaxon Corp. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), this question must be resolved according to Illinois choice-of-law principles. When addressing choice-of-law issues in tort actions, Illinois courts apply the "most significant contacts" test. *Palmer v. Beverly Enters.*, 823 F.2d 1105, 1112 (7th Cir.1987); *Ingersoll v. Klein*, 46 Ill.2d 42, 48, 262 N.E.2d 593, 596 (1970). Under the most significant contacts test, the court should apply the law of the state that has the most significant relationship with the occurrence and with the parties. *Ingersoll*, 46 Ill.2d at 47, 262 N.E.2d at 596. Several factors are relevant to this determination, including: (1) the place where the injury occurred; (2) the place where the conduct occurred; (3) the domicile, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship of the parties is centered. *Id.* at 47–48, 262 N.E.2d at 596.

■ After weighing the factors articulated in *Ingersoll, supra,* this court finds that Illinois has the most significant relationship to the cause of action. LT's fraud claim is predicated on several misrepresentations allegedly made by Peterson during the course of the contract negotiations. All of the negotiations regarding the asset purchase agreement were conducted at Peterson's offices in Chicago, Illinois. Thus, any alleged fraudulent misrepresentations made by Fink (or any other representative of Peterson) necessarily occurred in Illinois. Illinois is also the place where the injury occurred. LT took possession of Peterson's assets in Illinois and continued to manufacture, package, and ship Eyegel from that location. Moreover, the relationship between the parties was centered in Illinois, the place where the asset purchase agreement was negotiated, executed, closed, and performed. None of Peterson's representatives went to Massachusetts in connection with the negotiation or performance of the asset purchase agreement. Although the remaining factor—*i.e.*, the domicile, place of incorporation, and place of business of the parties—does not appear to conclusively favor one state over the other, the weight of the contacts dictates that Illinois law is to govern LT's fraud claim.[2]

■ Under Illinois law, a party cannot maintain a fraud claim without alleging the following five elements:

(1) a false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.

*Derson Group, Ltd. v. Right Management Consultants, Inc.*, 683 F.Supp. 1224, 1228 (N.D.Ill.1988) (quoting *Soules v. General*

---

**2.** Similar to the fraud claim, LT's other tort claims have very little connection with Massachusetts. For the most part, these claims stem from the same alleged misrepresentations giving rise to the fraud claim. Therefore, based on the same choice-of-law analysis set forth above, the court finds that Illinois law is applicable to all of LT's tort claims.

LT's contract claims will also be evaluated according to Illinois law. Under the most significant contacts test—the approach commonly employed by Illinois courts in contract disputes—the following factors must be considered: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, place of incorporation, and place of business of the parties. *Palmer*, 823 F.2d at 1108–09; *Champagnie v. W.E. O'Neil Constr. Co.*, 77 Ill. App.3d 136, 145, 32 Ill.Dec. 609, 615, 395 N.E.2d 990, 996 (1979). Although the fifth factor is inconclusive because the parties reside and conduct business in separate states, the first four factors clearly favor Illinois. Illinois is the place of contracting, negotiation, performance, and the location of the subject matter of the asset purchase agreement.

*Motors Corp.*, 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980)). LT alleges in Count I that Peterson made knowing misrepresentations concerning the quality of the Eyegel product. But LT's counterclaim contains no allegations that the misrepresentations were made with the intent to induce LT to take some affirmative action—such as entering into the asset purchase agreement. This deficiency is fatal to LT's fraud claim. *See id.* at 1231. LT urges the court to infer from the allegations that the misrepresentations were made to induce LT to enter into the asset purchase agreement. This court, however, is not willing to infer a necessary element of fraud from LT's skeletal allegations—especially since fraud must be pled with particularity. *See* Fed.R.Civ.P. 9(b). Because LT has failed to allege that the misrepresentations were made with the intent to induce LT to act, Count I is dismissed.

*Count III—Negligent Misrepresentation*

■ In Count III, LT claims that it sustained a loss of profits and goodwill due to Peterson's alleged negligent misrepresentations. In order to recover for purely economic loss under a theory of negligent misrepresentation, LT must demonstrate that Peterson supplied the information in the course of its business "for the guidance of others in their business relations with *third parties.*" *Black, Jackson and Simmons Ins. Brokerage, Inc. v. IBM Corp.*, 109 Ill.App.3d 132, 135, 64 Ill.Dec. 730, 732, 440 N.E.2d 282, 284 (1982) (emphasis in original); *see also Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 89, 61 Ill.Dec. 746, 755, 435 N.E.2d 443, 452 (1982).

LT argues that "nonprofessional sellers are in the business of providing information for the purpose of a sale of their property," and that Peterson was in the business of providing information about its products when it sold the company to LT. *LT's Memorandum in Response to Plaintiffs' Motion to Dismiss*, at 5. This argument is indefensible. To a certain extent, information will always be exchanged during the course of a business transaction. Nevertheless, a manufacturer such as Peterson is not "in the business of supplying information" merely because it provides information regarding its products. *See Knox College v. Celotex Corp.*, 117 Ill. App.3d 304, 308, 72 Ill.Dec. 703, 453 N.E.2d 8, 11 (1983) (manufacturer of roofing materials was not in the business of supplying information); *Black, Jackson and Simmons*, 109 Ill.App.3d at 136, 64 Ill.Dec. at 732, 440 N.E.2d at 284 (sellers of computer and software were not in the business of supplying information); *cf. Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App.3d 154, 164, 109 Ill.Dec. 541, 547, 510 N.E.2d 409, 415 (1987) (sellers of real estate, unlike real estate brokers, are not in the business of supplying information). The information must be provided to guide others in their business transactions with *third parties*—a crucial factor which LT has overlooked.

The information furnished by Peterson in connection with the sale of its assets only facilitated business between Peterson and LT. Such information related strictly to the acquisition of Peterson and was not provided to LT for guidance in its business relations with third parties. Quite simply, Peterson is a manufacturer of health and beauty aid products; it is not in the business of supplying information. For this reason, the court dismisses LT's negligent misrepresentation claim.

*Count IV—Intentional Misrepresentation*

■ Peterson contends that the intentional misrepresentation claim set forth in Count IV should be dismissed because LT has failed to allege all of the elements of intentional misrepresentation. To state a claim for intentional misrepresentation, a party must allege:

(1) a statement of material past or present fact; (2) that the statement was false; (3) that the party making the statement knew or believed it to be false; (4) that the party to whom the statement was made believed and relied on the statement and had a right to do so; (5) that the statement was made for the purpose of inducing the other party to act or refrain from acting; and (6) that the reliance of the person to whom the statement was made led to his injury.

**514**

*Modern Track Mach., Inc. v. Bry–Lon, Ltd.,* 197 Ill.App.3d 560, 564, 144 Ill.Dec. 65, 68, 554 N.E.2d 1104, 1107 (1990). Similar to the deficiency in LT's fraud claim, LT's intentional misrepresentation claim is devoid of any allegations that Peterson or Fink made a misrepresentation for the purpose of inducing LT to act. Having failed to plead a necessary element of intentional misrepresentation, LT's claim cannot withstand Peterson's motion to dismiss.[3]

### Count V—Negligence

■■■■ Count V purports to state a claim for negligence. LT's negligence claim rests on a single conclusory allegation that the contamination of Eyegel was caused by the "negligent failures and omissions" of Fink and Peterson. *Counterclaim,* ¶ 30. By failing to affirmatively allege the existence of a duty and a breach thereof, LT's negligence claim has not satisfied even the most basic of pleading requirements. Moreover, LT's claim is flawed in another substantial respect: LT seeks to recover "lost profits, returned product merchandise, and damages to its reputation and goodwill." *Id.* ¶ 31. As Peterson correctly points out, a party cannot recover under a negligence theory when the loss is purely economic in nature. *See Moorman Mfg. Co.,* 91 Ill.2d at 86–88, 61 Ill.Dec. at 753–55, 435 N.E.2d at 450–52.

While tort law is particularly suited to redress personal injuries or damage to property, the remedies of contract law are more appropriate for the type of commercial loss allegedly sustained by LT. When a defect prevents a product from functioning as intended, contract and warranty law serve to protect the purchaser's expectation interests. *Id.* at 81, 86–88, 61 Ill.Dec. at 753–54, 435 N.E.2d at 448, 450–51. LT seeks redress for qualitative defects in the Eyegel product which rendered the product inferior and unfit for its intended use. To recover for such economic loss, LT cannot proceed on a negligence theory. Count V is dismissed.

### Count VI—Breach of the Asset Purchase Agreement

■■■ LT contends that both Peterson and Fink are liable for breach of the asset purchase agreement. Peterson moves to dismiss this claim as to Fink only. According to Peterson, Fink is not a party to the asset purchase agreement. The very terms of the agreement, however, refute Peterson's argument.

Several provisions of the asset purchase agreement explicitly and unambiguously state that Fink and Peterson are jointly and severally liable for the obligations under the contract. The asset purchase agreement provides in part:

> Brighton[4] and Jacob J. Fink, *jointly and severally,* hereby make to LT the following representations, warranties, agreements and covenants....
>
> ....
>
> In the event there is a breach of any one or more of the aforementioned representations, warranties, agreements and covenants which gives rise to damages, costs or a loss to LT, then Brighton and Jacob J. Fink, *jointly and severally,* agree to reimburse LT for such damages, costs or loss (including attorneys fees, if any)....
>
> ....
>
> Brighton and Jacob J. Fink shall each be notified in writing by LT of any claims or suits to which the preceeding [sic] paragraph relates and be given a reasonable opportunity to settle, contest, or defend against same, and, if after having been so notified, Brighton or Jacob J. Fink shall fail to so defend, settle, and ultimately satisfy or defeat such claim within a reasonable time, Brighton and LT [sic] shall reimburse LT, on demand, for any payment made by LT including its reasonable attorneys fees or expenses.

*Asset Purchase Agreement,* ¶ 8 (emphasis added). Aside from the fact that Fink as-

---

**3.** Peterson has also moved to strike Count IV, claiming that LT's fraud and intentional misrepresentation claims are redundant. Since the court has granted Peterson's motion to dismiss

with respect to Counts I and IV, Peterson's motion to strike Count IV is denied as moot.

**4.** Peterson was formerly known as Brighton Products, Inc. ("Brighton").

sumed liability under the contract, he signed the document twice—in his representative and individual capacities. Fink is clearly a party to this agreement and, therefore, the motion to dismiss Count VI is denied.

### Count VIII—Breach of Express Warranty

■ LT asserts a breach of express warranty claim in Count VIII. Peterson insists that LT's breach of contract claim in Count VI and the breach of express warranty claim in Count VIII are redundant. Pursuant to Fed.R.Civ.P. 12(f), Peterson moves to strike the breach of warranty claim.[5]

To a large extent, LT is seeking the same relief in its breach of contract and breach of warranty claims. But nothing in the Federal Rules of Civil Procedure precludes a party from setting forth alternative theories of recovery based on the same set of facts. To the contrary, Federal Rule 8(e)(2) states that "[a] party may set forth two or more statements of a claim ... alternately or hypothetically, either in one count ... or in separate counts...." Fed.R.Civ.P. 8(e)(2).

Of course, Peterson may not obtain a duplicative recovery. However, at this stage of the litigation, the court will not compel LT to elect one remedy over another. See Miller v. Affiliated Fin. Corp., 600 F.Supp. 987, 996–97 (N.D.Ill.1984); Weft, Inc. v. G.C. Inv. Assocs., 630 F.Supp. 1138, 1143–44 (E.D.N.C.1986), aff'd, 822 F.2d 56 (4th Cir.1987). In the absence of any readily apparent prejudice to Peterson, this court sees no reason why LT cannot assert breach of contract and breach of warranty claims in the same complaint. Therefore, Peterson's motion to dismiss is denied with respect to Count VIII.

### Counts IX and X—Breach of Implied Warranties

■ In addition to its breach of express warranty claim, LT seeks relief for breach of the implied warranties of merchantability and fitness for a particular purpose pursuant to Article 2 of the Uniform Commercial Code ("UCC"). See Ill.Rev.Stat. ch. 26, pars. 2–314, 2–315 (1989). Article 2, however, applies only to "transactions in goods." Ill.Rev.Stat. ch. 26, par. 2–102 (1989). The UCC defines "goods" as "all things ... which are movable at the time of identification to the contract." Ill.Rev. Stat. ch. 26, para. 2–105(1) (1989).

■ In support of its motion to dismiss, Peterson argues that it "did not sell 'goods' to LT but rather sold the bulk of its assets." Memorandum in Support of Peterson's Motion to Dismiss, at 7. Contrary to Peterson's assertion, corporate assets may be characterized as "goods" under certain circumstances. See Cianbro Corp. v. Curran–Lavoie, Inc., 814 F.2d 7, 13–14 (1st Cir.1987) (contract for the sale of the assets of a construction company, consisting mainly of equipment and inventory, was a "sale of goods" as defined in Article 2 of the UCC); DeFilippo v. Ford Motor Co., 516 F.2d 1313, 1323 (3d Cir.), cert. denied, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975) (sale of an automobile dealership was a transaction in goods under Article 2). The question, then, is whether the assets sold by Peterson qualify as goods within the meaning of the UCC. To determine whether a particular transaction involves the sale of goods or non-goods, Illinois courts apply the "dominant purpose" test. See Yorke v. B.F. Goodrich Co., 130 Ill.App.3d 220, 223, 85 Ill.Dec. 606, 608, 474 N.E.2d 20, 22 (1985); Wico Corp. v. Willis Indus., 567 F.Supp. 352, 355 (N.D.Ill.1983). A contract which predominantly involves the sale of goods is subject to the UCC in its entirety.

LT acquired Peterson's inventory, machinery, and other equipment, as well as its so-called "intangible assets." See Asset Purchase Agreement, ¶ 1. The machinery, equipment and inventory sold by Peterson may be classified as goods; such physical

---

**5.** In the alternative, Peterson argues that the warranty claim should be dismissed as to Fink because Fink is not a party to the asset purchase agreement. That argument will not provide a basis for dismissal. This court has already ruled that there are sufficient facts which indicate that Fink is a party to the asset purchase agreement.

assets were "movable at the time of identification to the contract." Ill.Rev.Stat. ch. 26 par. 2–105(1) (1989). The remaining assets—which are of an intangible nature—include Peterson's tradenames, trademarks, logos, advertising, artwork, customer lists, sales records, unfulfilled sales orders, goodwill, and licensing agreements. *Asset Purchase Agreement*, ¶ 1A. These assets cannot be legitimately characterized as goods, and LT has not identified any authority which suggests that such assets fall within the scope of Article 2.

Having concluded that Peterson's tangible assets are goods, and that its intangible assets are non-goods, the court must next determine whether the transaction predominantly involved the sale of goods or non-goods. LT purchased the assets of Peterson for $1,200,000. *Affidavit of Ronald DeClassis*, ¶ 2. The intangible assets, or non-goods, accounted for $1,000,000 of the total purchase price. *See Asset Purchase Agreement*, ¶ 3A. The tangible assets were sold for $200,000, approximately 17% of the total purchase price. In light of the fact that only a relatively small percentage of the total purchase price consisted of goods, the court concludes that the transaction at issue cannot be characterized as a sale of goods. *Compare Cianbro*, 814 F.2d at 13–14 (the agreement was predominantly for the sale of goods as 98% of the total purchase price represented equipment and inventory) *with Field v. Golden Triangle Broadcasting, Inc.*, 451 Pa. 410, 423 & n. 9, 305 A.2d 689, 696 & n. 9 (1973), *cert. denied*, 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974) (contract for the sale of two radio stations was not a sale of goods; the physical assets represented only 4.6% of the total purchase price) *and Dravo Corp. v. White Consol. Indus., Inc.*, 602 F.Supp. 1136, 1140–41 (W.D.Pa.1985) (Article 2 did not apply to a corporate acquisition because goods represented less than one-half of the purchase price). Since the sale of Peterson's assets was not a sale of goods, the UCC does not provide an avenue of relief for LT's implied warranty claims.

■ LT argues that even if the warranties were not made in connection with the sale of goods, it may nonetheless recover under a common law warranty theory. Illinois courts have recognized certain implied warranties at common law. *See, e.g., Naiditch v. Shaf Home Builders, Inc.*, 160 Ill.App.3d 245, 264, 111 Ill.Dec. 486, 497, 512 N.E.2d 1027, 1038 (1987) (implied warranty of habitability accompanying the sale of a home); *Harmon v. Dawson*, 175 Ill. App.3d 846, 849, 125 Ill.Dec. 406, 409, 530 N.E.2d 564, 567 (1988) ("one who contracts to perform construction work impliedly warrants to do the work in a reasonably workmanlike manner"). LT, however, has not cited a single Illinois case recognizing a common law implied warranty which would extend to the type of transaction involved in this case—*i.e.*, the sale of a corporation's assets. Supplying no authority for its position, LT cannot pursue a claim for breach of a *common law implied warranty*. Peterson's motion to dismiss with respect to Counts IX and X is granted.

### Count XI—Massachusetts Unfair Trade Practices Statute

■ In Count XI, LT asserts a claim under the Massachusetts unfair trade practices statute, which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass.Ann.Laws ch. 93A, § 2(a) (Law. Co-op 1985). The statute applies only to conduct that occurs "primarily and substantially within [Massachusetts]." Mass.Ann.Laws ch. 93A, § 11 (Law. Co-op Supp.1990).[6]

LT claims that Peterson violated the unfair trade practices statute by "expressing material misrepresentations concerning the quality of the goods sold to LT." *Counterclaim*, ¶ 51. Yet, LT does not allege that any misrepresentation was made in Massachusetts, much less than an unfair or deceptive act occurred primarily and substantially within Massachusetts. Peterson conducted little, if any, business activity in Massachusetts. In fact, the transaction giving rise to LT's cause of action occurred primarily in Illinois. LT initiated the con-

---

**6.** Section 11 of the statute provides that "[n]o action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." Mass.Ann.Laws ch. 93A, § 11 (Law. Co-op Supp.1990).

tract negotiations in Illinois, and all negotiations regarding the purchase of Peterson's assets were conducted in Illinois. As noted previously, the alleged misrepresentations occurred in Illinois. Because the alleged unfair trade practice did not occur in Massachusetts, the Massachusetts statute is inapplicable. *See Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 638, 473 N.E.2d 662, 672 (1985); *Goldstein Oil Co. v. C.K. Smith Co.*, 20 Mass.App.Ct. 243, 479 N.E.2d 728, 732 (1985). Therefore, Peterson's motion to dismiss Count XI of LT's counterclaim is granted.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to dismiss is granted with respect to Counts I, III, IV, V, IX, X, and XI of defendants' counterclaim, and denied with respect to Counts VI and VIII. Plaintiffs' motion to strike is denied.

IT IS SO ORDERED.