**WRIGHT–MOORE CORPORATION, Plaintiff–Appellant and Cross–Appellee,**

v.

**RICOH CORPORATION, Defendant–Appellee and Cross–Appellant.**

**Nos. 92–1060 and 92–1140.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1992.

Decided Nov. 10, 1992.

Rehearing and Rehearing En Banc Denied Dec. 10, 1992.

As Amended Dec. 30, 1992.

Philip A. Whistler (argued), Cory Brundage, Fred R. Biesecker, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., Vincent J. Backs, Beers, Mallers, Backs, Salin & Larmore, Fort Wayne, Ind., for Wright–Moore Corp.

James P. Fenton (argued), Robert S. Walters, Barrett & McNagny, Fort Wayne, Ind., for Ricoh Corp.

Before CUMMINGS and MANION, Circuit Judges, and ZAGEL, District Judge.*

CUMMINGS, Circuit Judge.

In January 1986, Wright–Moore Corporation filed an eight-count complaint against Ricoh Corporation because it refused to renew its national distributorship agreement with Wright–Moore after the expiration of its one-year term. On motion for summary judgment, Judge Lee held that Ricoh had good cause not to renew the distributorship agreement and that Ricoh did so in good faith and without discriminating. The district court held too that Ricoh did not breach its contract with Wright–Moore or engage in fraud or misrepresentations as to the contract. The court also refused to compel Ricoh to renew Wright–Moore. On the prior appeal, we affirmed in part, reversed in part and remanded. 908 F.2d 128 (1990). This opinion disposes of the questions left open on remand.

Wright–Moore is an Indiana corporation with its principal place of business in Fort Wayne, Indiana, and is an independent distributor of copiers. It has developed a network of independent authorized dealers that it supports with service training, fa-

---

* The Honorable James B. Zagel, United States District Judge for the Northern District of Illinois, is sitting by designation.

vorable credit terms and minimal inventory requirements. Ricoh is a New York corporation with its principal place of business in West Caldwell, New Jersey. It manufactures copiers, related parts and supplies and distributes them through independent dealers like Wright–Moore and through its own network of retail dealers.

As pointed out in our prior opinion, in early 1984 the parties entered into a one-year agreement under which Wright–Moore agreed to distribute Ricoh 3000 Series copiers. In July of that year, the parties entered into a superseding one-year agreement under which Wright–Moore was appointed a national distributor for both the Series 3000 and Series 4000 Ricoh copiers. Under this agreement Wright–Moore had to purchase 2,850 copiers during the contract year and bear the costs of providing Ricoh-prescribed training courses for the personnel of each dealer to whom Wright–Moore sold a Series 4000 machine. Accordingly, Wright–Moore sent employees to Ricoh's headquarters for training and subsequently they trained the service personnel of each Wright–Moore dealer. Wright–Moore was also required to maintain an extensive inventory of copier parts.

As shown in our prior opinion, under this one-year agreement the relationship between the parties was that of supplier and distributor. The distributor's territory was the continental United States and Wright–Moore was permitted to sell as a wholesaler to retailers not affiliated with Ricoh. While Wright–Moore was forbidden from using any Ricoh trademark in connection with Wright–Moore's name, it was permitted to state that it was authorized to distribute certain Ricoh products.

At the same time as the distributorship agreement was executed, a related "letter agreement" was completed. In that agreement Wright–Moore agreed to purchase immediately 1,200 machines toward the 2,850 requirement of the distributorship agreement. The letter agreement provided Wright–Moore with "price protection" in the event of a price change and allowed it to purchase more copiers on the same credit terms as the 1,200 machines covered in the letter agreement. At the end of the contract term, Ricoh refused to renew Wright–Moore's distributorship, causing this suit to be filed against Ricoh.

In its original opinion in this case, the district court found there was no evidence of a Sherman Act conspiracy. As to the Indiana franchise statutes relied upon by Wright–Moore, the court held that Indiana law was applicable and that there was a material issue of fact whether Wright–Moore qualified as an Indiana franchisee. The district court also decided that the letter agreement was not breached because the distributorship agreement allowed Ricoh unilaterally to change terms of credit and because Ricoh honored its price protection clause. The court found no fraud or misrepresentation by Ricoh and found that Wright–Moore could not reasonably rely on any Ricoh oral representations made before the contract was formed. Consequently Ricoh was granted summary judgment.

In our prior opinion we agreed that Indiana law applies to the distributorship agreement and that summary judgment for Ricoh would be inappropriate on the issue of whether Wright–Moore was a franchisee, but that Ricoh's non-renewal of the distributorship agreement for internal economic reasons did not, by itself, constitute good cause under Indiana law. Next we determined that there was no discrimination in terminating Wright–Moore.

Our prior opinion also determined that there was a mixed question of fact and law as to whether Ricoh could unilaterally change the terms of credit under the letter agreement, but that "price protection" in that agreement and in the distributorship agreement did not require Ricoh to preserve Wright–Moore's margin but only required Ricoh to refrain from selling copiers to anyone else at a lower price. Next we held that since the distributorship agreement was specifically for one year, Wright–Moore was not entitled to rely on any oral representations by Ricoh that it would be renewed. We also upheld summary judgment against Wright–Moore's two fraud claims with respect to Ricoh's supposedly

misrepresenting its intent to renew the distributorship agreement.

On the remand, Ricoh contended that Wright–Moore was never a franchisee under the Indiana franchise statutes despite Wright–Moore's contentions that it had paid an indirect franchise fee. Judge Lee decided that Wright–Moore was not required to pay a franchise fee, so that it was not a franchisee under the Indiana statutes. Next, assuming that Wright–Moore was a franchisee under the relevant Indiana Acts, the district judge concluded that Ricoh did not have an obligation to renew the distributorship agreement.

Thereafter Judge Lee held that *res judicata* barred plaintiff from claiming that Ricoh had breached contractual credit terms because this Court did not disturb the district court's prior grant of summary judgment on that claim, and that the Uniform Commercial Code did not require a contrary holding because Wright–Moore had previously provided Ricoh with a false and misleading credit application, had misrepresented its annual sales by $3.3 million, and had wrongly claimed a $250,000 credit line with its own shell corporation. Moreover, the district court pointed out that Ricoh had expressed concern over Wright–Moore's credit position and had explored obtaining a letter of credit from Wright–Moore and even a personal guarantee from Jack Wright, principal of Wright–Moore, and his wife.

Finally, the district court decided that plaintiff was not entitled to punitive damages because even if Ricoh interfered with CopyRite, one of plaintiff's dealers, Copy-Rite was not required to purchase products from Wright–Moore, and because Ricoh was rightly concerned about extending further credit to Wright–Moore. Consequently, Judge Lee granted Ricoh summary

judgment on plaintiff's claim for punitive damages. In sum, the district court concluded that Ricoh was entitled to summary judgment on the franchise issues.[1] The district court also provisionally held that even if Wright–Moore were a franchise, Ricoh would be entitled to summary judgment on the claim for wrongful non-renewal, the claim for breach of credit terms, and the claim for punitive damages, so that it dismissed the action. We affirm.[2]

I. Applicability of Indiana Franchise Act

Wright–Moore's principal argument is that it was a franchisee entitled to the protections of the Indiana Franchise Act. A franchise is defined therein (Indiana Code § 23–2–2.5–1(a)) as follows:

(a) "Franchise" means a contract by which:

(1) a franchisee is granted the right to engage in the business of dispensing goods or services, under a *marketing plan* or system prescribed in substantial part by a franchisor;

(2) the operation of the franchisee's business pursuant to such a plan is *substantially associated* with the franchisor's trademark, service mark, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and

(3) the person granted the right to engage in this business is *required to pay a franchise fee*. (Emphasis supplied.)

Thus the three key elements of a franchise include existence of a marketing plan, substantial association, and payment of a franchise fee. In our previous opinion, we held there was sufficient evidence of a marketing plan and substantial association but left open the question whether Wright–Moore was required to pay a franchise fee.[3]

---

1. Since we hold that the Indiana Franchise Act does not apply, there is no need to consider Wright–Moore's proposition that the Act applies to its entire distributorship under *Diesel Service Company v. AMBAC International Corp.,* 961 F.2d 635 (7th Cir.1992), and not just to the Indiana territory.

2. Ricoh's motion to strike portions of Wright–Moore's reply brief is denied.

3. In our recent opinion in *Hoosier Penn Oil Co. v. Ashland Oil Co.,* 934 F.2d 882 (1991), the Court was concerned only with the first two elements and held they were not satisfied. *Hoosier Penn* and our prior opinion herein are not irreconcilable as plaintiff suggests because the records are entirely different.

Therefore upon remand the district court had to decide whether Wright–Moore was required to pay a franchise fee, which is defined in Indiana Code § 23–2–2.5–1(i) as follows:

> * * * any fee that a franchisee is required to pay directly or indirectly for the right to conduct a business to sell, resell, or distribute goods, services or franchises under a contract agreement, including, but not limited to, any such payment for goods or services. "Franchise fee" does not include:
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (3) the purchase or agreement to purchase goods at a bona fide wholesale price.

Plaintiff insists that it paid an indirect franchise fee by payments to maintain excess inventory and payments for training.

### A. Excess inventory claim

■ Construing the distributorship agreement and the letter agreement together, we agree with the district court and the defendant that plaintiff was not required to pay a franchise fee in the form of excess inventory through the letter agreement requirement that it purchase 1,200 copiers. Since Wright–Moore resold almost all of the 1,200 machines at a profit before it was required to make final payment for them, its argument must fail. It received a large discount on its 1,200–machine order, giving it a price advantage over defendant's other distributors. As Judge Lee pointed out, these Ricoh machines were so scarce that plaintiff could have sold them at almost any price to anyone it wished to. It is immaterial that plaintiff purchased a large portion of its inventory from defendant. *Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp.,* 944 F.2d 1131, 1141–1142 (3rd Cir.1991). Since the evidence showed that Wright–Moore was not overstocked by Ricoh, there was no excessive inventory constituting an indirect franchise fee.

### B. Training expense claim

■ Plaintiff also asserts that the costs it incurred in training some of its dealers amounted to a franchise fee. However, even Jack Wright for plaintiff described this service training as just an expense of doing business. The evidence showed that plaintiff recovered its training costs because its own dealers received expert training on Ricoh models which enabled them to service these and even other brands of copiers with little training. Consequently plaintiff has not shown that its training expenses amounted to a franchise fee.

### II. Punitive damages for breach of credit terms and interference with contract

■ Wright–Moore asserts two claims for punitive damages. The first is for Ricoh's alleged breach of Wright–Moore's credit terms. Wright–Moore claims that under the letter agreement in January 1985 it exercised an option to purchase an additional 3,000 copiers and only received 1,000 of them. Ricoh refused to sell the machines under the credit terms of the letter agreement and insisted on cash. For this, Wright–Moore claims punitive damages under the Indiana Deceptive Franchise Practices Act (Indiana Code § 23–2–2.7–1(3)), which bars "allowing substantial modification of the franchise agreement by the franchisor without the written consent of the franchisee." This argument fails because we have already ruled that plaintiff is not a franchisee entitled to the protections of the Deceptive Franchise Practices Act. Plaintiff argues in the alternative (in one paragraph of a lengthy brief) that its option to purchase 3,000 additional copiers was a contract for the sale of goods under the Uniform Commercial Code (Indiana Code § 26–1–2–204). However, the evidence showed that Ricoh was requesting a cash payment for these copiers in view of its legitimate concern about plaintiff's ability to pay. Any reliance on the Uniform Commercial Code is misplaced because Ricoh has never contested that there was such a contract, but rather that it was excused from selling 2,000 more copiers to plaintiff in view of Wright–Moore's financial position.

■ Wright–Moore's second claim for punitive damages is based on tortious interference with contract. Ricoh persuaded

CopyRite, one of Wright–Moore's Indianapolis-area dealers, to buy copy machines directly from Ricoh rather than through Wright–Moore. Wright–Moore alleges that Ricoh's actions induced CopyRite to breach its contract with Wright–Moore. Plaintiff's claim focuses on a "best efforts" clause in the contract between Wright–Moore and CopyRite that stated that "Dealer agrees to promote the goodwill and name of Wright–Moore and to do everything within its capacity to further the interest of Wright–Moore." This claim fails because under the express terms of the contract with Wright–Moore, CopyRite was a non-exclusive dealer, entitled to buy copiers from whomever it pleased. Regardless of the meaning or enforceability of the "best efforts" clause under Indiana law, Wright–Moore cannot argue that CopyRite breached its contract by buying copiers from Ricoh. The contract's non-exclusive dealer clause bars Wright–Moore's second punitive damages claim as a matter of law.

III. The distributorship agreement was a non-renewable contract

██ Even viewing the distributorship agreement as constituting an Indiana franchise, it was a non-renewable contract within the meaning of Section 1(8) of the Indiana Deceptive Franchise Practices Act (Indiana Code § 23–2–2.7–1(8)). As we noted in our prior opinion, the agreement itself contains only a one-year term, although Wright–Moore had endeavored to obtain a two-year term. Article 9(a) of the distributorship agreement required the negotiation and execution of an entirely new written agreement, showing that renewal was not automatic but that a new agreement would be necessary for renewal. Since this contract contained a non-renewable one-year term, under the above statutory provision good cause was not needed to enable defendant to terminate it.

Judgment affirmed.[4]

---

4. Because judgment for Ricoh is affirmed, there is of course no need to consider its cross-appeal.