Greg HORNER and Marqetta
Horner, Appellants,

v.

Robert TILTON and Mailboxes and
Parcel Depot, Inc., Appellees.

No. 49A02–9412–CV–00748.

Court of Appeals of Indiana.

May 31, 1995.

Rehearing Denied July 7, 1995.

Gordon B. Dempsey, P.C., Indianapolis, for appellants.

Jeffrey C. McDermott, Krieg DeVault Alexander & Capehart, Indianapolis, for appellees.

## OPINION

FRIEDLANDER, Judge.

Greg and Marqetta Horner appeal an order granting a motion to dismiss their tort and breach of contract action against Robert Tilton and Mailboxes and Parcel Depot, Inc. (hereinafter referred to as "Mailboxes"). The Horners present the following restated issues for review:

I. Did the court err in concluding that the agreement between the Horners and Mailboxes did not create a franchise?

II. Did the court err in giving effect to a forum-selection clause in the contract between the Horners and Mailboxes?

We affirm.

The facts favorable to the judgment are that Mailboxes and Parcel Depot, Inc. is an Illinois corporation engaged in the retail mail services business, offering in-house mail and packaging-related services. According to Tilton, Mailboxes's president and chief executive officer, Mailboxes "serves as a shipping agent for the United States Postal Service, United Parcel Service and all other major shipping services." *Record* at 43. Tilton also "provide[s] consulting services to customers who purchase the Mailboxes license to open other Mailboxes retail stores." *Record* at 44.

In March 1993, the Horners, who lived in Illinois at the time, contacted Tilton about the possibility of opening a Mailboxes business in Illinois. Tilton mailed a questionnaire which the Horners completed and returned to Tilton. The Horners then met with Tilton for four hours at Mailboxes's Illinois offices. At this meeting, the parties discussed the various features of owning and operating a Mailboxes store. In August, 1993, the Horners contacted Tilton and informed him that they were planning to move to Indiana and would be interested in opening a Mailboxes store in Kokomo, Indiana. Tilton sent the Horners a second questionnaire, which they completed and returned on August 25.

In Illinois on August 26, 1993, the Horners signed a letter of intent "to purchase the consulting services, support services, licenses, equipment and supplies ... for the purpose of opening and operating an affiliated parcel, postal and business services store in the City of Kokomo". *Record* at 52. The letter of intent contained the following provision:

"5. *Choice of Law and Forum* The parties expressly agree that the law of the State of Illinois shall be applied in inter-

preting and applying this Letter of Intent, and that any disputes involving the Letter of Intent, or the rights and obligations of the parties created by or through this Letter of Intent or the business relationship established hereby shall be resolved in the Circuit Court of the State of Illinois, Peoria County." *Record* at 54.

Tilton accepted the Horners' letter of intent on August 28, 1993. In Illinois on September 10, 1993 the Horners signed a purchase agreement setting out the terms of the business relationship between Mailboxes and the Horners. The purchase agreement contained a forum-selection provision identical to the one appearing in the letter of intent, except that "Purchase Agreement" was substituted for "Letter of Intent". Pursuant to the Purchase Agreement, the Horners paid to Mailboxes the sum of $19,894.00 for certain services. The nature of the "services" for which the Horners paid was detailed in the Purchase Agreement:

" 'the Services' shall mean the consulting and support services to be offered by Mailboxes to the Purchaser, including but not limited to information regarding a site for the store; negotiating for the lease or purchase of that site; the renovation, decorating, equipping, and furnishing of the store; advice as to signage, pricing, inventory and future business opportunities; obtaining any non-assignable license to utilize Mailboxes as a trademark as described more fully herein, and obtaining the equipment and supplies purchased to an addendum attached hereto." *Record* at 55.

On October 20, 1993, the Horners informed Tilton that, as of October 23, 1993, their mailing address would be Frankfort, Indiana instead of Tuscola, Illinois. The Horners opened a Mailboxes store in Kokomo on November 15, 1993. On January 2, 1994, Mr. Horner telephoned Tilton and informed him that the Horners would be closing the Mailboxes store on January 7, 1994. After closing the store, the Horners demanded partial repayment of the money they paid to Mailboxes. Tilton refused the request for a refund.

On April 18, 1994, the Horners filed a complaint for damages against Tilton and Mailboxes in Marion Superior Court, alleging several theories of liability, including breach of contract. On June 6, 1994, Mailboxes filed a Motion to Dismiss or in the Alternative to Transfer Venue, based upon the contention that the forum-selection clause contained in the purchase agreement compelled the Horners to file their action in the Circuit Court of Peoria County. The court granted Mailboxes's motion to dismiss on August 24, 1994 and this appeal ensued.

## I.

The Horners contend that the forum-selection clause contravenes the statutory prohibition against a franchise agreement provision which limits litigation for breach of the agreement. Mailboxes responds that the agreement did not create a franchise relationship between Mailboxes and the Horners.

Ind.Code 23–2–2.5–1 provides:

"(a) 'Franchise' means a contract by which:

(1) a franchisee is granted the right to engage in the business of dispensing goods or services, under a marketing plan or system prescribed in substantial part by a franchisor;

(2) the operation of the franchisee's business pursuant to such a plan is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and

(3) the person granted the right to engage in this business is required to pay the franchise fee."

Pursuant to IC 23–2–2.5–1, to qualify as franchise under Indiana law three elements must be present: (1) a marketing plan; (2) substantial association with the franchisor's trademark; and (3) payment of a franchise fee. *Master Abrasives Corp. v. Williams* (1984), Ind.App., 469 N.E.2d 1196, *disapproved on other grounds, Enservco, Inc. v. Indiana Sec. Div.* (1993), Ind., 623 N.E.2d 416; *see also Wright–Moore Corp. v. Ricoh Corp.* (1992), 980 F.2d 432.

In *Master Abrasives Corp.*, the court determined that the agreement contained a

marketing plan. This conclusion was based upon the following items contained in the agreement: (1) the state was divided into marketing areas; (2) the franchisor could establish sales quotas; (3) the franchisor had the right of approval of sales personnel hired by the franchisor; (4) the sales personnel of the franchisee were required to attend sales training conducted by the franchisor at which the employees were given quotation sheets, invoices and other sales forms; and (5) the franchisees were required to elicit information from customers as to the use the customers would make of the franchisor's products. Although no concrete test emerges from the *Master Abrasives Corp.* analysis, the principle to be applied is apparent. The court examines the nature of the obligations that the agreement imposes upon the putative franchisee, particularly with respect to franchisor mandates regarding sales of goods or services.

■ The agreement in the instant case imposed the following obligations upon the Horners:

"3.1 To conform to all specifications relating to the use of Mailboxes' trademarks on signs, stationery and other identifying material, and to never assign, transfer or otherwise alienate any signs, stationery or any other items which use, contain or include Mailboxes' trademark.

3.2 To train [the Horners'] personnel in order to protect Mailboxes' trademark and the License granted herein.

3.3 To conform to the guidelines, standards, rules and regulations which are established from time to time by the parcel organizations which [the Horners] shall use (e.g. United Parcel Service) as essential and necessary for the operation of the Store, including, where applicable, standards of cleanliness, uniformity or operations and quality of business management procedures.

3.4 To open the Store in the geographical area designated above within ninety days of the execution of this Agreement." *Record* at 13.

The agreement also granted to the Horners an exclusive license to use the Mailboxes trademark. Finally, the Horners retained the right, at their discretion, "to use a business name of [the Horners'] choice for the store if [the Horners] elect[ed] not to identify [their] business with Mailboxes." *Id.*

The list of factors indicating the creation of a franchise in *Master Abrasives Corp.* was not intended to be exhaustive. However, it is significant that none of those circumstances are present in the instant case. The Horners were not subject to sales quotas, and more importantly, they were not included in a marketing scheme on the part of Mailboxes, notwithstanding the Horners' contention that "[t]he agreement defines a geographical area." Appellants' Brief at 5. The specification of geographical location in the agreement was used only in defining the limits of the license granted to the Horners by Mailboxes for using Mailboxes's trademark and certain of Mailboxes's products. Pursuant to the agreement, Mailboxes did not retain any rights of control, training, or approval with regard to employees of the Horners' business, except the right to require that the Horners' employees be instructed how to protect Mailboxes's trademark and license.

In summary, the agreement did not subject the Horners to the kind of control by the putative franchisor as was the case in *Master Abrasives Corp.* In fact, the Horners were free to select a business name other than Mailboxes in the event that they "elect[ed] not to identify [their] business with Mailboxes." *Record* at 13. We conclude that the agreement did not subject the Horners to the degree of control and oversight on the part of Mailboxes which is necessary to constitute a "marketing plan" within the meaning of IC 23–2–2.5–1(a)(1). Because the elements of a franchise identified in IC 23–2–2.5–1(a) are set out in the conjunctive, the absence of one of the three elements compels the conclusion that no franchise was created. Therefore the agreement did not create a franchise and the prohibition in IC 23–2–2.7–1(10) does not apply.

## II.

The Horners contend that the court erred in enforcing the forum-selection clause contained in the written agreement.

■ This court has held that forum-selection provisions are not *per se* invalid.

"[C]ontractual provisions, even those occurring in form contracts, that seek to limit the litigation of future actions to particular courts or places are enforceable if they are reasonable and just under the circumstances and there is no evidence of fraud or overreaching such that the agreeing party, for all practical purposes, would be deprived of a day in court. In the usual case, no public policy reason exists to preclude parties from establishing venue by a contractual provision." *Mechanics Laundry & Supply, Inc. v. Wilder Oil Co., Inc.* (1992), Ind.App., 596 N.E.2d 248, 252 *trans. denied.*

When determining whether a particular forum-selection provision is enforceable, courts evaluate not only whether the provision is reasonable and just, but also whether the provision was freely negotiated. *Tandy Computer Leasing v. Milam* (1990), Ind.App., 555 N.E.2d 174. Application of the test is fact-sensitive. *Id.* In *M/S Bremen v. Zapata Off-Shore Co.* (1972), 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513, the Supreme Court discussed the nature of the three elements considered in analyzing the viability of a forum-selection clause, i.e., justness, reasonableness, and freedom of negotiation.

■ The consideration of whether a contract is freely negotiated involves a comparison of the bargaining position of the parties to the contract. This inquiry is similar to that undertaken by courts to determine whether a contract is unconscionable because of a disparity in bargaining power. In such cases, a contract is unconscionable if there exists a great disparity between the parties which leads the weaker party to sign the contract unwillingly or without awareness of its terms. *See White River Conservancy Dist. v. Commonwealth Engineers, Inc.* (1991), Ind.App., 575 N.E.2d 1011, *trans. denied.* Therefore, courts are required to examine the relative sophistication of the parties and the circumstances surrounding the agreement.

■ Mr. Horner was a self-employed small business owner for six years prior to executing the contract with Mailboxes. Mail-boxes was a company comprised of three people generating annual gross sales of only $100,000 per year. The parties met several times over a period of months and spent hours discussing the Horners opening a Mailboxes store. Finally, the forum-selection clause was prominently displayed as paragraph 16 of the agreement, under the heading "Choice of Law and Forum." *Record* at 61. We discern no significant disparity in the sophistication or bargaining power of the parties and conclude that the contract, including the forum-selection clause, was freely negotiated.

■ The *Bremen* Court stated that such a forum-selection clause should not be enforced if "enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or judicial decision." *Id.* at 15, 92 S.Ct. at 1916. The Horners fail to identify a strong Indiana public policy which would be adversely affected if the suit were brought in Illinois, as opposed to Indiana. There is no reason to believe that application of the laws of Illinois to the issues presented by the Horners would necessarily yield different results than would application of the laws of Indiana. Perhaps more to the point, the Horners have failed to identify a strong Indiana public policy which would be afforded greater protection by Indiana law than by Illinois law.

The Court noted that

"[c]ourts have also suggested a forum clause, even though it is freely bargained for and contravenes no important public policy of the forum, may nevertheless be 'unreasonable' and unenforceable if the chosen forum is *seriously* inconvenient for the trial of the action." *Id.* at 16, 92 S.Ct. at 1916 (emphasis in original).

The Horners desire to litigate this action in Marion County, Indiana. According to the forum-selection clause, however, the action must be litigated in Peoria County, Illinois. The Horners' burden under these circumstances was explained in *Bremen:* "[I]t should be incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical

purposes be deprived of his day in court." *Id.* at 18, 92 S.Ct. at 1917. Indiana and Illinois are contiguous states and the distance between the two counties in question may be traversed by automobile in several hours. Therefore, it cannot be said that, in the context of the issue before us, Peoria County, Illinois is a remote forum. We conclude that the Illinois forum does not provide a seriously inconvenient forum for litigation of this action which will, for all practical purposes, deprive the Horners of their day in court.

In summary, the forum-selection provision was freely negotiated, and litigation of the Horners' action in Peoria County, Illinois will not be gravely inconvenient to the parties. We therefore find no basis to support a conclusion that it would be unjust or unreasonable to hold the Horners to their agreement to litigate disputes stemming from the contract with Mailboxes in the contractually agreed upon location of Peoria County, Illinois. The trial court did not err in granting Mailboxes's motion to dismiss.

Judgment affirmed.

KIRSCH and DARDEN, JJ., concur.