# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-4247

THOMAS HINC,

*Plaintiff-Appellant,*

v.

LIME-O-SOL COMPANY,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 4302—**Elaine E. Bucklo**, *Judge.*

———————

ARGUED JUNE 8, 2004—DECIDED AUGUST 31, 2004

———————

Before EASTERBROOK, KANNE, and DIANE P. WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* Thomas Hinc, a resident of Illinois, sued Lime-O-Sol Company ("LOS"), an Indiana corporation with its headquarters in Indiana, for breach of contract. Holding that LOS's contractual obligation to use its "best efforts" to market the product developed by Hinc was too vague to be enforceable, the district court granted summary judgment in favor of LOS. Hinc appeals. We reverse.

## I. History

Through his experience in the paint industry and as an employee handling claims for the Sherwin-Williams Company, a paint manufacturer, Hinc became aware of the recurring problems of surfactant leaching and tannin bleeding, which cause brown surface stains on painted exteriors. Often, because of this discoloration, paint manufacturers and insurance companies were forced to repaint entire commercial complexes at their own expense. Hinc sought to find a cost-effective remedy by inventing a product that would remove the stains, eliminating the need to repaint. Hinc mixed different ingredients and tested them on stains, eventually finding one that worked. Hinc's product, which he named Less Work Painted Surface Stain Remover ("Stain Remover"), combined a certain proportion of a secret ingredient with a shower-cleaning product manufactured by LOS ("Shower Cleaner").

Hinc used a hand-mixed batch of his Stain Remover to remove exterior stains from a building painted with Sherwin-Williams paint, saving Sherwin-Williams approximately $100,000. Lacking knowledge of the Shower Cleaner formula but understanding the commercial potential of Stain Remover, Hinc contacted LOS about his invention in early 1999.

Over the next several months, LOS and Hinc explored whether Hinc's product would be viable. During this time frame, Hinc visited LOS's facility in Ashley, Indiana at least two times to discuss potential applications of Stain Remover. LOS representatives never visited Illinois for any reason relating to Stain Remover. The parties negotiated over the telephone.

In August of 1999, Hinc and LOS came to an agreement. LOS signed the contract in Indiana on August 17, 1999. Hinc signed in Illinois the following day and mailed it back to LOS. The contract provided that while Hinc would retain

ownership of the secret ingredient, he would divulge it to LOS. LOS would produce and distribute Stain Remover while keeping Hinc's secret ingredient confidential. Hinc would receive $10 per gallon sold. Without discussion between the parties as to its meaning, the contract contained a term obligating both parties to use their "best efforts" to market the product "in a manner that seems appropriate." The contract, which was subject to annual review, contained a provision allowing either party to cancel upon ninety-days written notice.

After he signed the contract, Hinc supplied LOS with the secret ingredient and secured orders for Stain Remover with Sherwin-Williams. LOS filled these orders with its Shower Cleaner, not the combined product containing Hinc's secret ingredient. LOS claims production difficulties prohibited filling the orders with Stain Remover, and, in order to deliver the orders on time, Hinc agreed to allow LOS to ship Shower Cleaner instead of Stain Remover. Hinc denies he ever agreed to this. Ultimately, LOS never produced, marketed, or sold Stain Remover during the duration of the contract.

After one year, in early September of 2000, Hinc requested either a new agreement that would guarantee him a minimum payment of $2000 per month or the Shower Cleaner formula so that he could seek marketing and further production through a different manufacturer. LOS refused to divulge its portion of the Stain Remover formula—the formula for Shower Cleaner—or agree to the new terms. The contract was renewed as previously signed.

On May 7, 2001, LOS sent Hinc a letter informing him that LOS had changed management and wanted to materially alter the terms of the contract. On May 9, 2001, Hinc sent LOS a letter outlining LOS's failure to market or promote Stain Remover and notifying LOS that he would cancel the contract in ninety days, on August 9, 2001.

Hinc filed a breach of contract suit against LOS in the Northern District of Illinois based on diversity jurisdiction. The district court, applying Indiana law, granted LOS's motion for summary judgment and dismissed Hinc's suit. In its order, the court determined that the "best efforts" provision contained in the contract was vague and unenforceable as a matter of Indiana law.

On appeal, Hinc argues that Indiana law governs his suit, while LOS claims that Illinois law applies. Hinc also argues that the district court improperly granted summary judgment because contracts with "best efforts" clauses are readily enforceable under Indiana or Illinois law.

## II. Analysis

For federal subject-matter jurisdiction to exist in this diversity case, we must satisfy ourselves that the amount in controversy exceeds $75,000 as required by 28 U.S.C. § 1332(a). Because this was not an issue raised below, we requested, at oral argument, that Hinc explain the basis for his assertion that his damages at the time of filing would exceed $75,000. Hinc pointed to LOS's internal memo from July of 1999, drafted prior to the contract at issue, which contemplated selling 500 gallons of Hinc's product for each of the next six months. Because the contract required LOS to pay Hinc $10 per gallon sold, Hinc claims damages of $5000 for each month that the contract was in effect until he voided the contract almost two years later. Therefore, the amount in controversy appears to exceed the $75,000 threshold (24 months x $5000 = $120,000), which leads us to conclude that there is federal subject-matter jurisdiction.

Hinc appeals the district court's grant of LOS's motion for summary judgment. We review the court's decision de novo, viewing the facts and drawing all inferences in favor of Hinc, the non-moving party. *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 674 (7th Cir. 2003). Sum-

mary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## A. Indiana Law Applies

Initially, we must determine whether Indiana or Illinois law applies. The contract here does not contain a choice-of-law provision. Federal courts sitting in diversity apply the choice-of-law rules of the forum state to determine the applicable substantive law. *Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 873 (7th Cir. 2000) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Illinois has adopted the "most significant contacts" test proffered by the Restatement (Second) of Conflicts § 188 (1971) in deciding choice-of-law disputes with respect to contractual issues. *Ruiz v. Blentech Corp.*, 89 F.3d 320, 323-24 (7th Cir. 1996); *Wildey v. Springs*, 47 F.3d 1475, 1481-83 (7th Cir. 1995). Under this test, "the contacts relevant to the choice-of-law decision include 'the place of contracting, negotiation, performance, location of the subject matter of the contract, and the domicil[e], residen[ce], place of incorporation, and business of the parties." *Wildey*, 47 F.3d at 1483 (quoting *Palmer v. Beverly Enters.*, 823 F.2d 1105, 1109-10 (7th Cir. 1987)). Hinc and LOS disagree on which state has the most significant contacts, with Hinc arguing that the contract is governed by Indiana law and LOS claiming that Illinois law applies.

Hinc signed the contract in Illinois the day after LOS signed in Indiana. "The place of contracting is the jurisdiction wherein is accomplished the last act necessary to give validity to the contract." *Ill. Tool Works v. Sierracin Corp.*, 479 N.E.2d 1046, 1051 (Ill. App. Ct. 1985). The common law mailbox rule provides that once an offer is made, acceptance is effective when the offeree puts the signed contract in the

mail. Restatement (Second) of Contracts § 63 (1979); *see Gordon v. Tow*, 498 N.E.2d 718, 723 (Ill. App. Ct. 1986). Thus, under the mailbox rule, the place of contracting is Illinois because the contract became effective when Hinc mailed the contract in Illinois.

Negotiation of contractual terms took place over the telephone while each party was in its home state. Prior to the drafting of the contract, Hinc visited LOS in Indiana to discuss possible applications of his formula; LOS representatives never entered Illinois. Therefore, the place of negotiation favors Indiana.

The place of performance favors Indiana as well. The issue in this suit is LOS's alleged failure to make any effort in carrying out its contractual obligation to market Stain Remover. This alleged breach occurred in Indiana, where LOS made its business decisions. Moreover, the subject matter of the contract—production and marketing services to be performed by LOS—is located in Indiana. With Hinc residing in Illinois and LOS in Indiana, the domicile factor is neutral.

While the place of contracting favors Illinois, the place of negotiation, the place of performance, and the location of the subject matter of the contract all favor Indiana. On balance, we agree with the district court that Indiana law controls this case.

## B. "Best Efforts" Clause

Having found that Indiana law governs, we must now decide whether the "best efforts" clause contained in the parties' contract is so ambiguous as a matter of Indiana law that it may not be enforced. Neither the parties nor our own

research has found an Indiana Supreme Court or Indiana appellate court ruling on point.[1]

When, as here, a federal court sitting in diversity is called upon to decide an unsettled question of state law, our obligation is to deduce, as closely as possible, how the Indiana Supreme Court would rule. *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 636-37 (7th Cir. 2002). "[F]ederal courts of appeals must review de novo the district court's determination of the content of state law . . . ." *Id.* at 636 (citing *Salve Regina Coll. v. Russell*, 499 U.S. 225 (1991)).

Where possible, Indiana courts will construe contracts as being valid, rather than void. *Ind.-Am. Water Co., Inc. v. Town of Seelyville*, 698 N.E.2d 1255, 1259 (Ind. Ct. App. 1998). In applying Indiana contract law, the primary purpose is to ascertain and give effect to the intentions of the parties. *Ft. Wayne Bank Bldg., Inc. v. Bank Bldg. & Equip. Corp. of Am.*, 309 N.E.2d 464, 467 (Ind. Ct. App. 1974). This requires courts to "read the agreement in a manner which harmonize its provisions as a whole and to give effect to the

---

[1] The district court, in finding the "best efforts" clause at issue here so vague as to be unenforceable, relied exclusively on *Wright-Moore Corp. v. Ricoh Corp.*, 794 F. Supp. 844 (N.D. Ind. 1991), *aff'd*, 980 F.2d 432 (7th Cir. 1992). In that diversity case, the district court in Indiana applied general Indiana contract-interpretation principles in finding a contract clause with the caption "Best Efforts" unenforceable for vagueness. *Id.* at 867. There, unlike here, the "best efforts" clause contained a quota provision; yet, that provision was never enforced and a quota was never assigned, leading the court to determine that the clause was vague and indefinite and thus, unenforceable. *Id.* On appeal, we declined to address the enforceability of the "best efforts" clause, affirming on other grounds. *See Wright-Moore Corp. v. Ricoh Corp.*, 980 F.2d 432, 437 (7th Cir. 1992). Thus, we do not agree that *Wright-Moore* supports LOS's position that, as a matter of law, the best efforts clause at issue here is unenforceable because of vagueness.

parties' expressed intent." *Kelly v. Smith*, 611 N.E.2d 118, 121 (Ind. 1993). "In most cases, the intent of the parties to a contract is to be determined by the 'four corners' of the contract[,]" *Dick Corp. v. Geiger*, 783 N.E.2d 368, 374 (Ind. Ct. App.), *trans. denied*, 792 N.E.2d 47 (Ind. 2003), "giving the words contained therein their plain, usual, and ordinary meaning," *Samar, Inc. v. Hofferth*, 726 N.E.2d 1286, 1290 (Ind. Ct. App. 2000). "When a court finds a contract to be clear in its terms and the intentions of the parties apparent, the court will require the parties to perform consistently with the bargain they made." *First Fed. Sav. Bank of Ind. v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (Ind. 1990). An ambiguous contract is construed against the drafting party. *MPACT Constr. Group, LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 910 (Ind. 2004).

Keeping in mind the general principles and rules of construction of Indiana contract law outlined above, we now turn to the contract in this case. The clause at issue here states: "This is a 'best efforts' agreement on the part of Lime-O-Sol and Thomas P. Hinc to market such product in a manner that seems appropriate." The phrase, "in a manner that seems appropriate," is obviously indefinite and could mean different things to different people, but we do not believe that the clause as a whole is so vague as to be unenforceable as a matter of law. LOS, which drafted this provision of the contract, agreed to put forth its "best efforts" to market Stain Remover and required the same of Hinc. "Best efforts," as commonly understood, means, at the very least, *some* effort. It certainly does not mean *zero* effort—the construction LOS urges here to escape any obligation under its contract. *Cf. Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1373 (7th Cir. 1990) (noting that the term "best efforts" is "a familiar one in contract parlance"); E. Allen Farnsworth, *On Trying to Keep One's Promises: The Duty of Best Efforts in Contract Law*, 46 U. Pitt. L. Rev. 1, 8 (1984) (noting that fifty years ago it was

generally accepted that a duty defined only in terms of best efforts was too indefinite to be enforced, but that such a view is no longer widely held today). We believe that Indiana's highest court would take the approach that "best efforts" provisions can be contractually enforced.[2]

### III.  Conclusion

The "best efforts" clause at issue here was not so vague as to be unenforceable under Indiana law. We therefore REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

A true Copy:

      Teste:

                              _____

*Clerk of the United States Court of Appeals for the Seventh Circuit*

---

[2]  A different question, that we do not resolve, is whether no marketing effort, which LOS admits was what it exerted here, was the "manner that seems appropriate" given the circumstances of this case. This, however, is a disputed issue that must be addressed by a fact finder.